If everybody's ready, I will call the case of the United States of America v. Michael and Barbara Rojas. Good morning to the panel. This is Thomas Sculfani, and I'm here on behalf of Michael Rojas. If you're going to please, this is a mortgage fraud case in which the defendant and his mother were indicted on a number of counts of wire fraud as well as a few counts of bank fraud. There are a couple of issues that I wish to bring to the court's attention this morning, the first of which deals with counts 2 through 11. Those counts would be subject to an enlarged statute of limitations because the acts occurred 10 years prior to the time of the indictment. The issue there is that the government simply failed to prove any reasonable connection between SunTrust Bank, which I'll refer to simply as bank, and SunTrust Mortgage, which I'll refer to as mortgage. The only evidence that we have is, first of all, the government called a former vice president of mortgage who was asked what is the relationship between mortgage and bank, and his answer was that mortgage is a wholly owned subsidiary of bank. In 2017, we certainly do not disagree. The problem was it did not say anything about 2006 and 2007. Second of all, there was evidence of wire transfer that came directly from bank to Miller. Miller was the company that dealt with the real estate business, which was simply removed from Rojas. In other words, there was no really any other good testimony. There were no board of directors' minutes to show the relationship between the two entities. There was no contract. There was no evidence about common directors or shareholders. There was no loan agreement stating, for example, from any of the persons who applied for mortgages that their mortgage could be sold to another financial institution. In other words, Rule 29 should have been granted. There was simply only speculation about the relationship between the two. The second issue is the one concerning the testimony concerning diminished capacity by the expert psychiatrist and the jury charge that followed. That applies to all counts and certainly would result in a new trial. Specifically, Mr. Michael Rojas suffered during the time period involved, which was an 11-month period between 2006 and 2007, which is when all of these 14 transactions occurred. He suffered from Bipolar I disease with psychotic episodes, which is apparently the most serious of the bipolar gradations. The question here and what the trial counsel sought to do was to be able to have this expert testimony so that you could draw the conclusion that Mr. Rojas lacked the ability to form specific intent. He wasn't contesting anything else other than the fact that he did not have the ability to form specific intent to commit the wire and bank fraud counts. That was effectively emasculated by the district judge because the district judge simply would allow the psychiatrist to give the jury a primer on what Bipolar I disorder with psychotic episodes means. That is not how it would apply specifically to this case. Once again, recognizing there is certainly a fine line between a comment on the ultimate issue, which was that for the jury, and which was certainly not something that was being argued or requested by the defense. Which then brings us to the instruction, which is really a problem. The requested instruction, which appears on page 261, which was the theory of defense, was simply that there has been testimony that Mr. Rojas, during the relevant time period of the indictment, was suffering from a mental health condition. It may have impacted his judgment. What ended up happening was that the trial judge declined to give the theory of defense instruction. He frankly gave an instruction that did not accurately depict what the theory of defense was because the trial judge charged that the theory of defense was that he could not formulate specific intent in mid-2007. That is not what was being proffered and that was not what the testimony was. The testimony was that Mr. Rojas suffered from this condition during the operative 11 month time period, not only in mid-2007. Finally, just getting back, if I can, before my time expires, to the first issue, that being the jurisdictional issue. The government, in its brief, cited several cases, Rebuffo, for example. They're all distinguishable on its facts. In Rebuffo, the defendant rolled the mortgage into a construction loan, which was with the bank as opposed to the mortgage company. Clearly, the defendant was on notice that the bank would be affected. In Martin, there was an agreement that the mortgage could be sold to another financial institution, thereby putting the defendant on notice that there was an increased risk of loss. In Mullins, which the government cited, the government proved meticulously how the fraud affected both the lender and the bank. In O'Brien, which is what the government cited to the court in the 28-J, which set up the 10th Circuit, the defendant there conceded that the mortgage company was a wholly owned subsidiary. I think it was a Citibank. But there were also numerous documents that showed how both the bank and the mortgage company funded loans. So our situation is really more exemplified in Bennett, which was out of the ninth. I will not expire, counsel. Okay, thank you. Good morning, your honors. I may have pleased the court. Mike Smith on behalf of Barbara Rojas. We have in our brief addressed four issues. We've raised the jurisdictional argument, which was just argued by Mr. Scafani and adopted by Ms. Rojas on pages 13 or 14 through a brief. So I don't intend to comment on this argument. We also raised the abuse of the court's discretion in failing to deny a government's motion to exclude evidence of certain legitimate loan evidence. I am not going to further argue that here. We rest on the brief I've raised that the government's responded. That's at my brief, pages 19 through 22. What I would like to address is the two issues of the incredibly and facially disparate sentences of Ms. Barbara Rojas compared to all other individuals in this case, as well as the sufficiency of the evidence as it may apply to her. Regarding the sentence, and this is argued at pages 22 through 27, and I've also included a little bit of a chart reflecting the sentences. Ms. Rojas was sentenced to a total term of 114 months, and that sentence was greater than the total combined sentences of everybody else that was sentenced in this case. There were 13 players in all. Seven of the players, the corrupt banker who really was involved in falsifying the bank application, the information on the financials, etc., was never even indicted. None of the straw buyers were indicted. In fact, the Miller Title employees who were in charge of actually preparing the HUD ones, preparing or assisting the borrowers in the loan applications, going through the loan process and through the closing process, none of the closing agents or employees were indicted. The only people that were indicted along with Ms. Rojas and her son, and they were the title owners, would be Carlos Jitrick, who was the main recruiter. He was the architect of this entire fraudulence scheme, who ended up with ultimately on a $20-plus million loss, a 19-month sentence. And all the other recruiters combined had less than Ms. Rojas. Most of those sentences were in the 20-month range, so we have argued that even just facially, this is disparate punishment for what we would consider proceeding to trial, as we all know what's been called the trial penalty. Regarding the sufficiency of the evidence, I just wanted to point out to the court that you have a 60-year-old-plus woman, a first offender, the mother and co-owner of a title company, which the title company doesn't prepare the HUDs. They don't submit the information, they don't submit the applications for the loans, they simply really go over the documents and they disperse funds at close. And there's no showing that Ms. Rojas was ever personally involved in any of the closings, that she knew of the fraudulent conduct of anyone, and that would be the recruiters, bankers, loan officers, closing agents, sellers, straw purchasers, and she never prepared or signed any loan application or HUD documents. It appears that the government's argument is, even though this woman is in charge of or at least co-owner of a title company that's conducting over, at this period, anywhere from 100 to 200 closings a month, several years later gets indicted for 12 residential loans that the government suggests are hinky. And I think, if I read their argument, their suggestion of sufficiency of the evidence goes to the source of the funds to close, which were not from the borrowers, but rather were from sellers that were invested, put the money into the escrow account, and sometimes the escrow account was made for the, provided the funds to close. But nowhere in the documents is that prohibited. I believe the HUDs say, by or on behalf of the borrower. And, in fact, many instances, title companies accept funds from family members, third parties, investors, real estate companies, et cetera. In this particular case, the lender never prohibited that conduct and never explicitly prohibited or excluded that conduct. And so, therefore, really doing nothing other than signing a few papers or a few checks, a woman that's been sitting in an office by herself that's being run by the recruiters, that's being run by the employees, none of whom are indicted, we believe the evidence in that scenario is insufficient to sustain the conviction as to all counts. Thank you. Contrary to what the defense is arguing, all that is required to show an effect on a bank is for the scheme to have created a risk of loss to the bank. A bank need not have been the target of the fraud, nor does the government have to prove that the bank sustained actual losses to support the wire fraud charge. The government proved this increased risk of loss in two main ways. First, by introducing testimony from two witnesses, that is, SunTrust Mortgage's former VP of operations as well as a federal agent, which showed that SunTrust Mortgage was a wholly owned subsidiary of SunTrust Bank. Second, the government introduced SunTrust Bank's general ledger entries, which showed that SunTrust Bank had funded each of the charged loans. As further evidence of funding, the government also introduced Miller Title's bank account statements, which plainly showed that the loan proceeds were wired by SunTrust Bank out of Atlanta, Georgia, not SunTrust Mortgage. The wire confirmations also had the borrower's names, which further linked SunTrust Bank's transfer to the fraudulent loan proceeds. Today, counsel have made chiefly four arguments. First, they take a hyper-technical reading of witness Jason Rabel's testimony by relying on the fact that he used the present tense, when in context, it's clear he was talking about the time period at issue. The counsel overlooks two key features of his testimony. First, the questions leading up to the parent subsidiary discussion were all focused around the time period at issue. And second, the witness was employed at the bank from 2006 to 2012, so he couldn't have been talking about the bank's relationship at the time of the trial, but instead was relying on his prior knowledge of the bank's structure. Moreover, a second witness, Lou Sellers, the government's investigator, testified to the same relationship, and his response was specific to the 2006-2007 time period. Second, defense counsel argues that the bank had a loss mitigation agreement, and it appears that their sole evidence for this inference comes from letters showing that SunTrust Bank took a credit on its books when it funded loans at the heart of the scheme. First off, to the extent that there are multiple competing inferences that can be drawn from the evidence, the reading that favors the jury verdict should prevail. Second, if we look at the ledgers as somehow supporting a loss mitigation arrangement, this doesn't eliminate the risk of loss to SunTrust Bank. The risk still remains that Mortgage would fail to repay SunTrust Bank because it didn't get its payment from the borrowers. The defense's position is analogous to claiming that just because you hit someone wearing protective padding, this somehow means no assault occurred. Third, counsel relies heavily on the United States v. Bennett, a bank fraud case out of the Ninth Circuit, primarily because the case strongly criticizes the Cartwright decision's conclusion that devaluating a subsidiary invariably depletes the parent stock. But counsel overlooks the important distinction between bank fraud and wire fraud. As the Ninth Circuit and Bennett pointed out, unlike other statutes, the bank fraud statute does not make it a crime to devalue a financial institution's assets or, more specific to this case, to affect a financial institution. In highlighting the distinction between to affect a bank, that is, with respect to wire fraud, and to procure funds owned by a financial institution, which was the question at issue in the Bennett case because it was proceeding under a bank fraud charge, the Bennett court suggested that wire fraud could actually be satisfied with proof of the parent-subsidiary relationship, even though that evidence would not cut it for bank fraud. Fourth, this is more specific to Ms. Barbara Rojas, counsel emphasizes the lack of direct testimony from straw buyers implicating Barbara Rojas in the scheme. This argument, however, ignores the documentary evidence of testimony from at least three other witnesses, one of which testified that he had discussed the scheme's central deception with Barbara Rojas, i.e., that the straw buyers couldn't pay the cash to close. He testified that Barbara Rojas was present at the closing of some of the fraudulent transactions he was involved in. He also testified that Barbara Rojas had introduced him to Raymundo Fernandez as an officer that he could work with. Given Fernandez's role in the conspiracy, that is, as a corrupt loan officer within SunTrust Mortgage, the jury could infer that this early introduction allowed the conspiracy to get off the ground. Additionally, Roxana Tanaka, Barbara Rojas' employee at Miller Title, testified that Barbara Rojas had directed her to forge documents and to lie about the existence of B&D Title. Tanaka also testified that Barbara Rojas told her to lie to people who were calling and asking questions about B&D Title, directing her to inform people that B&D Title was a defunct company. Tanaka also identified Barbara Rojas' handwriting on certain key deposit slips, which were directly implicated in the scheme because they allowed the title company to hide the source of the cash-to-close funding. Christina Osasuna also identified Barbara Rojas' handwriting on certain key deposit slips, further supporting the same inferences. Additionally, counsel contested the sentence of Barbara Rojas, focusing on the entirety of the term, but overlooking the fact that she still received a 40% reduction from the lower end of the guidelines. Excuse me, this is Beverly Martin. I understood the argument more to go to the disparity, you know, where you've got people that were, you know, more authoritative in the overall scheme getting, you know, a 19-month sentence. And I understand all of that. You know, a lot of it has to do with prosecutorial discretion and people not putting the government to the, you know, trouble of a trial. But it does kind of strike me that the disparity is pretty extreme. I mean, I know you can do that, but do you think it's really a good idea to have these kind of extreme disparities between defendants that go to trial and the ones that don't? Well, Your Honor, to that I would say that defense is focusing on the disparity within one case. First of all, it's a very small sample size if you're only looking at the defendant and her co-defendants as a benchmark to evaluate disparity in sentences. In our brief, we cited a number of other cases where much greater sentences were affirmed by the 11th Circuit and other circuits in comparable fraud. She hasn't done a survey of our jurisprudence on that. She just knows these other people and what they did and what she did. And it seems like disparate treatment to her because she went to trial. But anyway, I don't contest that you can do that. I just wonder if it's a good idea. Well, and to that, Your Honor, I would also say that I believe Barbara Rojas' role here may not be fully fleshed out in the argument presented today. She wasn't just a bystander. She was one of two owners in the two closely held title companies that were at the heart of the scheme. And not only that, but she was directly responsible in depositing the proceeds, essentially, that were going to be used to pay back the bank. And without her title license, it would be difficult to conceive of the scheme having arisen the way that it did and the source of the funds to have been essentially occluded the way that they were. So I think she was not just a minor player. I mean, I think they're casting her in the role of, say, a Roxana Tanaka or a Christina Osasuna. But that definitely was not her role. She was instructing Roxana Tanaka on how to fill out these forms. She was telling Roxana to forge signatures on these forms. She was essentially the behind-the-scenes money person behind the scheme. I mean, I understand. I mean, the jury has decided the case, and I'm not, you know, I mean, that's their job. It's not mine. Didn't Ms. Tanaka testify that she was supervised both by Michael and Barbara Rojas? I mean, I didn't understand her testimony to really isolate Barbara Rojas as her supervisor. Did I misunderstand that? Well, she specifically says, so I'm reading from docket entry 268, and the PDF page number is 127. She was specifically asked, were you given any instructions as to what you were supposed to say about B&B title if anyone asked? Answer, that they no longer existed. Who gave you that instruction? Barbara Rojas. That's one example of her specifically calling out Barbara Rojas as her main supervisor who gave her very specific instructions. And, of course, B&B title is the company through which the fraudulent cash-to-clothes payments were provided in order to secure the source of those funds. She also identified Barbara Rojas' handwriting on a government exhibit 14E, 14G, 14H, and 14N. And those specifically are the deposit slips, depositing the cash-to-clothes funds, again, from B&B title into Miller title with respect to counts 3, 4, 5, and 8 respectively. So, it's, again, showing how Roxana Tanaka's testimony specifically implicated Barbara Rojas in the scheme, and, moreover, shows that Barbara Rojas wasn't simply standing behind the scenes. She was an active participant in this conspiracy, and she was very deeply connected to the mechanisms that allowed this conspiracy to succeed. So, for all of those reasons, it's not a disproportionate sentence considering her role and considering other sentences that have been affirmed. If there are no other questions, or if there are any other questions on the sentencing point, I'm happy to address them. But I would like to speak briefly about the mental health concerns that were raised by defense counsel. Effectively, what defense counsel is arguing is that their expert, Dr. Miller, should have been allowed to usurp the jury's role in essentially concluding for them that Michael Rojas, his judgment was somehow compromised. He could not form specific intent, and that is specifically what Rule 704B prevents us from doing. In a criminal case, an expert witness must not offer an opinion about whether the defendant did or did not have a particular mental state. What they're trying to do is disguise that opinion by casting it in terms of, well, what would the condition have done to Michael Rojas' mental state? And that sort of creativity, it's something that the rule envisions and it forecloses. So certainly precluding Dr. Miller from testifying to that level was not impermissible. It certainly was not error on the court's part. Ms. Hernandez, this is Judge Watkins. On that point, what effect do you contend that the parties' agreement to the limitations on the doctor's testimony had? Was that invited error as has been argued? And secondly, were there objections? I think there was a motion for judgment of acquittal or perhaps for mistrial involved. Can you explain that to us and how that happened? Sure, Your Honor. I'll take each question in turn. So first, the question of the instructions, Your Honor, is absolutely right. I mean, the instructions that were read to Dr. Miller, they were specifically read on by both parties. Two minutes, counsel. Two minutes. So to the extent that the defense is now arguing that this is error, it was certainly invited error. But I actually don't think, given the way that that testimony came in and in context, I don't think that that was something that was somehow an error on the trial defense team's part, given the fact that their entire theory of these transactions with respect to Michael Rojas and with respect to his mental illness was that with respect to the non-112 Palm Avenue transactions, he was simply, according to him, he was simply acting according to industry standard. And in his direct testimony when he took the stand, he testified multiple times that it was industry standard and in any party, not necessarily the buyer could provide the cash to close and this was not a problem. So it would be very inconsistent for him to say, on the one hand, I'm applying industry standard, but nevertheless, I'm also operating in a manic state for all of these other transactions. His mental illness defense was cabineted to the 112 Palm Avenue transaction precisely because he couldn't necessarily rely on the industry standard approach for this massive transaction. So I don't necessarily believe that it was error in applying those instructions, but in any event, to the extent they're arguing that it was error, it was certainly invited error. Multiple times defense counsel, even before the court officially stated that it would allow that testimony to come in, defense counsel said, I've instructed Dr. Miller on those instructions and we are readily accepting them. So to that point, I fully agree with the court. With respect to the motion for a new trial or the error, I believe that may have come up during the government's rebuttal testimony where there was some issue about whether the inspector, Lou Sellers, could have identified Barbara Rojas's, or excuse me, could have identified Michael Rojas's signature in the government's exhibit 15YY. The significance of that... Time has expired. Counsel, time has expired. May I finish the response? So the reason why 15YY is relevant and why they asked for a mistrial as a result of the investigator's identification of Michael Rojas's signature on 15YY is because it effectively undercuts what I said earlier about Michael Rojas's testimony about industry standard. He testified that whenever you have cash to close, it can be essentially supplied by anyone who's not the buyer. What 15YY in that series of transactions concerning the REA purchase, what that shows is in the process of supplying proof of the cash to close, the supporting document was doctored to reflect that the buyer, rather than being the title, was the actual supplier of the cash or the check in that case that was used to purchase the cashier's check. That was then submitted, or a fact of which was then submitted to provide evidence that the cash to close had been supplied. That undercuts that part of his testimony where he's claiming that it's industry standard because, again, why would... Ms. Hernandoz, could you wind your argument up, please? Your time has expired. I apologize, Your Honor. Thank you so much. That concludes my argument. All right. Thank you. Yes, thank you, Your Honor. This is Thomas Clefany again on behalf of Michael Rojas. With respect to counsel's argument as to the buyer fraud and jurisdiction, counsel for the government raised the analogy that that bank was like a parent who had custody and control over her children. Well, if that were the case, certainly as I think we all know, a parent certainly has their child living under their own roof and hopefully have control over them. It depends on what age they are, I suppose. If that were the case between bank and mortgage here, then mortgage would have been the alter ego of bank and clearly the corporate protection that both enjoy would have been dissipated. In fact, one need only look at the indictment itself, and the indictment itself distinguishes between mortgage being the lender and bank being the financial institution. I would suggest that as a result of the lack of evidence to show the relationship between the two, that in fact what we have is that if bank was defrauded, it was defrauded by lender as a result of its malfeasance and misfeasance and not as a result of what occurred with Mr. Rojas. Second of all, with respect to the diminished capacity, trial counsel ultimately agreed to a statement that had to be read to which constrained the testimony of the psychiatrist. That is because the district judge had ruled and I would most respectfully suggest having tried so many cases in 41 years that when a district judge makes a ruling and then gives you a choice and tells you to go see if you can figure something out consistent with my ruling, that one doesnít sit back in his chair counsel table and fold his arms. Consequently, weíre not dealing with an invited error situation. Weíre dealing with a situation where trial counsel who was acting as an officer of the court consistent with the courtís ruling but still objecting to it in his rule 29 at the end of the governmentís case certainly had not waived it or was not inviting error at this point in time. Finally, I would just make the point very clearly that the defendant testified and clearly in any trial if thereís any one particular piece of evidence that is most important for jury, itís when a defendant testifies. The defendant did not say that I did not knowingly sign the checks or do the transactions that are the subject of the case. But rather what ended up happening was the district judge misstated it when he said that his theory could only formulate specific intent in mid-2007 and more importantly that he did not act knowingly and willfully and with specific intent. Thank you very much. Thank you. I appreciate the argument. Good morning again, Your Honor. Itís Mike Smith on behalf of Barbara Rojas. Just to briefly respond to the governmentís suggestion of sufficiency of the evidence based on the testimony of two individuals, Mr. Jitrick and Ms. Tanaka. As to Jitrick, yes, he did say that sometime in 2005 he recalls he basically told her generally about a scheme. He didnít say any specifics. Again, thatís a year before any of the charged conduct. He never relayed what the conversation was, who was present, what was said. If you look through the transcripts, his testimony is wrought in general terms of they, referring to Barbara and Michael, what they did, or Barbara or Michael. Again, no specifics in general terms. Regarding the disbursement funds and the deposit slips, thereís nothing illegal about a title agent signing disbursement funds or signing documents. Thatís what they do. They review abstracts, they prepare policies, and they disperse funds. The only thing that was suggested was illegal about the funds was the source of the funds not being from the borrowers. Again, I reiterate, the lender never required that and there was no specific requirement for it. It could be honor-based by third parties. Lastly, Ms. Tanaka, who admitted that, according to her, the only thing that was suggested by Barbara was to sign a buyerís name to a document wasnít there. She specifically testified she did not consider it illegal. It was not for a purpose to commit a fraud or defraud or deceive a bank. Rather, it was simply to accommodate a buyer who may have forgotten to sign a document before they left. With that, I close my argument. Thank you. Thank you. Weíll take the case of Michael and Barbara Rojas under advisement. We appreciate the argument.